# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JAMES CRAIG CRISTINI,

      Petitioner,                            Civil No. 01-CV- 74483-DT
                                              HONORABLE DENISE PAGE HOOD
v.                                   UNITED STATES DISTRICT JUDGE

KEN McKEE,

      Respondent.

_____/

## OPINION AND ORDER CONDITIONALLY GRANTING
## THE PETITION FOR WRIT OF HABEAS CORPUS

James Craig Cristini, ("Petitioner"), presently confined at the Carson City Correctional Facility in Carson City, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In his *pro se* application, Petitioner challenges his conviction and sentence on one count of second-degree murder, M.C.L.A. 750.317; M.S.A. 28.549, one count of mutilation of a dead body, M.C.L.A. 750.160; M.S.A. 28.357, and habitual offender, second offense, M.C.L.A. 769.10; M.S.A. 28.1082.  For the reasons stated below, the Petition for Writ of Habeas Corpus is **CONDITIONALLY GRANTED.**

### I. Background

Petitioner's convictions arose out of the killing of James Scott Bussell, who died of blunt force injuries to his head after being assaulted in an auto body shop in Warren, Michigan owned by co-defendant Tayser Mona in the early morning of January 17, 1994. Petitioner was convicted of the second-degree murder and mutilation charges by a jury in

1

the Macomb County Circuit Court on May 23, 1995 and was convicted of being an habitual offender after a jury trial on June 14, 1995.

Tayser Mona was the main witness against Petitioner.  Mona had also been charged with the murder and mutilation of Bussell.  In July, 1994, a jury acquitted Mona of the murder charge at a separate jury trial, but convicted him of the mutilation charge and being a fourth felony habitual offender.  As a fourth habitual offender, Mona faced a possible life sentence.  Prior to his sentencing, Mona entered into an agreement with the prosecutor that called for Mona to testify against Petitioner.  In exchange for his agreement to testify, the Macomb County Prosecutor's Office agreed that Mona would be sentenced only as a third habitual offender, which would limit his maximum sentence liability to thirteen and 1/3 to twenty years.  The parties further agreed that Mona would be permitted to serve his state sentence in a federal prison.

Many of the facts in this case are undisputed.  Petitioner, Mona, and Bussell had spent the afternoon of January 16, 1994 at the Oakland Mall buying merchandise with bad checks.  Later that day, the three men stopped to see Mona's brother Tim Mona at his place of employment.  At 10:00 p.m. that night, the three men visited the Mona family home.  There was evidence that Bussell called his fiancee at around 12:15 a.m. on January 17, 1994.  From the background noise, Bussell's fiancee assumed that he was at a bar. Bussell was killed by blunt force injuries to his head in the early morning hours of January 17, 1994, at Mona's auto body shop in Warren, Michigan.  Mona assisted with transporting the victim's body to an alley near Seven Mile Road and John R in Detroit, Michigan. Bussell's body was burned with lacquer thinner from Mona's auto body shop.  This took place around 3:00 or 3:45 a.m.  Mona and another man drove to Oakland Mall to retrieve

2

Bussell's car, stopping at a gas station on Woodward Avenue to purchase some gasoline. Bussell's car was driven to Detroit near Six Mile Road and I-75, where it was set on fire. This took place shortly before 8:30 a.m.  Mona subsequently removed carpeting from his shop and did some repainting and sold a car which he used to move the victim's body. Significantly, there was no physical evidence which linked Petitioner to the murder, the scene of the killing, the location where the victim was recovered, or the victim's car.

The Detroit Police Department initially investigated the homicide. When they learned that the victim was last seen with Mona and Petitioner, Detroit police arrested Mona at his parole office on February 10, 1994.  The next morning, Mona admitted to his involvement in the moving and mutilation of the victim, but claimed that Petitioner had been responsible for the murder.

The case was ultimately turned over to the Warren Police Department on February 11, 1994.  Mona was interviewed by the Warren Police on February 11 and 12, 1994.  The officer in charge felt that there was time unaccounted for in Mona's account of the homicide.  Petitioner was not located until May, 1994, when he was arrested in Florida using the name Mark Sawka.  Petitioner was extradited back to Michigan on several unrelated criminal matters on July 31, 1994.

At trial, Tayser Mona testified consistently with statements that he had made to the police with some additions.  Mona indicated that on the night of the homicide, he, Bussell, and Petitioner had left his house and gone to Tycoon's Bar in Detroit, Michigan.  Around 2:00 a.m., the three men went to Mona's body shop to call for female escorts.  While there, Bussell and Petitioner got into a fight.  Petitioner started hitting and kicking Bussell in the upper body and head area.  At Petitioner's request, Mona turned up the radio while

3

Petitioner was assaulting the victim.  Petitioner told Mona that he had killed Bussell because he was a coward and had called him a "bitch."  Petitioner removed money, a wallet, and other personal effects from the victim's body.  Petitioner took lacquer thinner from Mona's shop.  Mona then helped put the victim's body in his car.  Mona originally told police that the victim's body was transported in his Oldsmobile, but later admitted that it was in his Nissan.

Petitioner drove Mona's Nissan and was holding a screwdriver.  Mona testified that he knew that Petitioner was dangerous and was afraid that he would kill him.  However, when asked why he would be with such a dangerous person, Mona testified that he did not believe that Petitioner was very dangerous or that he was a killer.  Mona indicated that he and Petitioner drove to Detroit.  In his original statement to police, Mona had told them that Petitioner took the victim's body out of the car, put it by the dumpster, doused it with the lacquer and set it on fire.  At trial, Mona admitted that he helped Petitioner place the victim's body by the dumpster.  As Mona walked back to the car, he turned around and observed Petitioner set the body on fire.

Petitioner and Mona returned to Mona's shop to clean it up.  The two men then drove to a motel on Eight Mile Road, where they discarded some carpeting from Mona's shop.  Petitioner also threw the victim's personal effects and bloody clothing out of the car while the men were driving along Eight Mile Road between Dequindre and Gratiot Avenues.  After purchasing some hamburgers at a White Castle Restaurant, the men headed for Oakland Mall.  Petitioner drove the victim's car with Mona following in his car.  The men then stopped at a gas station on Woodward Avenue, where Petitioner went into the gas station alone to purchase gas.  Petitioner later set the victim's car on fire in an area near

4

Six Mile Road and I-75 in Detroit.

Mona admitted that he had never previously told anyone that he and Petitioner had stopped and purchased hamburgers at the White Castle restaurant on Eight Mile Road. Mona acknowledged that the detectives had informed him that his time sequence for the crime was off.  Mona admitted that he had not previously mentioned Petitioner's statements about the victim being a coward and calling him a "bitch".  Mona insisted that only Petitioner had gone into the Amoco gas station to purchase the gas and denied that it was he who had purchased the gasoline.  Mona denied knowing that his employee, Daniel Brusseau, who lived at his auto shop, was there on the night of the murder.  Mona admitted being on parole for delivery of marijuana, had a prior conviction for passing bad checks, and had passed stolen checks at the Oakland Mall on the day of the murder. Mona admitted that he had offered to testify against Petitioner when he was taken into custody.

Michael Balinsky testified that he had seen Bussell together with Petitioner and Mona at the Oakland Mall at approximately 6:00 p.m. on January 16, 1994.  Balinsky testified that Petitioner did not have a beard.

Tim Mona, Tayser Mona's brother, testified that Bussell, Petitioner, and his brother left the Mona home around 10:00 p.m. on January 16, 1994 to go to Tycoon's.  Tim Mona testified that Bussell was wearing a leather jacket that night that his brother had wanted and that in February, Tim Mona saw his brother wearing Bussell's jacket.  Tim Mona originally told the police that his brother Tayser had been at home on January 17, 1994 at around 9:00 a.m. but later changed this.

The prosecution introduced telephone records which confirmed that two telephone calls had been made to an escort service from Mona's auto body shop in Warren at 2:04

5

a.m. and 2:19 a.m. on January 17, 1994.

Darold Sayler, a garbage collector, testified that on January 17, 1994, between 3:00 and 3:45 a.m., he tried to get to the dumpster in the alley in Detroit where the victim's body was found. Sayler's access to the dumpster was blocked by downed wires near one of the entrances to the alley. While doing paperwork, Sayler noticed three people coming down the alley as though they were moving something. The men came near the dumpster. Sayler then saw a fire start at the dumpster. Sayler blew his horn at the men and two of the men ran to a vehicle at the other end of the alley.

Jason Lee was a security guard at Oakland Mall. On January 17, 1994, he observed the victim's car parked at the mall at between 3:00 and 4:00 a.m. Between 7:00 and 8:00 a.m., Lee saw a second vehicle, which matched Mona's car, next to the victim's vehicle. Lee observed two white men in their mid-twenties to early thirties. One man was darker and had a moustache. Lee identified this man as being Mona. A second man was lighter complected, with blonde hair and about 210 pounds, with long bushy blonde shoulder length hair. Lee could not identify this man.

Athir Alkasmikha discovered the victim's burning body by the dumpster between 8:00 and 8:30 a.m. on January 17, 1994 and contacted the police. Various police and fire department witnesses testified that the victim's burning vehicle was discovered on January 27, 1994. The fire had been deliberately set by spreading gasoline in the car's interior. Two melted down plastic containers were found in the car, one with gasoline residue.

On February 15, 1994, two police detectives took a mug shot each of Petitioner and Mona to various gas stations to see if anybody recognized them. At an Amoco gas station at Eleven Mile Road and Woodward Avenue, Charlene Ramsey, a gas station attendant,

6

claimed that she recognized both men.  At trial, Ramsey testified that on January 17, 1994, between 7:00 and 8:00 a.m., Petitioner came in to the gas station and bought coffee from her, spilling it in the process.  Ramsey testified that Petitioner went outside and pumped gas into a container.  Ramsey testified that Mona had purchased this gas container from another gas station attendant named Malicia Christian.  Ramsey described the blonde haired man whom she identified as Petitioner as having long, collar length hair, and a moustache and facial hair.  On direct examination, Ramsey testified that she had never seen Petitioner before that morning, but admitted on cross-examination that she had told police that she thought that Petitioner was a regular customer.  In her written statement, Ramsey did not mention Petitioner coming into the gas station or purchasing or spilling coffee.

Malicia Christian had been shown both mug shots by the police but had only been able to identify Mona as one of the men who had been at the Amoco gas station on the day in question.  Christian testified that Mona came into the gas station on January 17, 1994 and had purchased a gas container from her.  Christian observed a second man, with blonde hair down to the back of his neck standing outside of their car pumping gasoline. Christian could not identify this man.

Because the pathologist was unavailable for Petitioner's trial, his prior testimony, from Petitioner's preliminary examination and Mona's preliminary examination and trial was read into evidence.  The pathologist indicated that there had been several blunt force injuries to the head, more than one and probably less than twenty.

Police went twice to Tycoon's bar, but none of the employees could identify any of the three men as having been there that night.  Police were also unable to find the evidence

7

which Mona claimed that Petitioner had discarded along Eight Mile Road.

Detective Christian indicated that he had testified at Mona's trial that there appeared to have been a significant struggle at Mona's auto body shop and that it would be difficult to explain that Mona was not involved in the assault.

The remainder of the prosecution's case consisted of calling seven witnesses to testify about prior assaults which had been committed by Petitioner.  Prior to trial, the prosecutor had filed a pre-trial notice to use this evidence pursuant to M.R.E. 404(b).  The prosecutor had sought to use this evidence to show Petitioner's *modus operandi* in committing unprovoked assaults to the heads of victims with various objects, as well as to establish Petitioner's identity as the killer and his intent to cause serious harm or death to the victim.  The prosecutor had also argued that this evidence would show that Petitioner had a propensity to commit such acts and that this evidence would show that between Petitioner and Mona, Petitioner must have been the person who killed the victim.  Over defense counsel's objection, the trial court ruled that these prior assaults were admissible.

In his opening argument to the jury, the prosecutor indicated that his case would not rely solely on Tayser Mona's testimony, but further indicated that there was character evidence which pointed to Petitioner being the murderer. (Trial Tr., May 3, 1995, p. 12).[1] The prosecutor also indicated that he would be introducing evidence of three prior assaults

---

[1] The Court notes that pages 4-12 are missing from the May 3, 1995 transcript provided by respondent.  Petitioner alleges in his application for writ of habeas corpus that the prosecutor made this remark in his opening argument, a factual allegation that is not disputed by respondent in his answer to the petition for writ of habeas corpus.  When a state's return to a habeas corpus petition fails to dispute the factual allegations contained within the habeas petition, it essentially admits these allegations. *Dickens v. Jones,* 203 F. Supp. 2d 354, 360 (E.D. Mich. 2002).  Because respondent does not dispute that this comment was made by the prosecutor in his opening remarks, the Court accepts this allegation as being true.

8

committed by Petitioner towards other individuals which he believed would show that Petitioner had a "propensity" for assaulting persons without provocation in the face and head with objects. (*Id.* at pp. 20-21).

Kimberly Sellers testified that in June of 1988, Petitioner, who was her ex-boyfriend, approached her car at a gas station, pulled her hair out, and extinguished a lit cigarette on her cheek. The certificate of conviction for assault and battery was introduced into evidence.

Officer Steven Popham testified that he took the assault complaint from Sellers and reiterated in great detail Seller's account of how Petitioner had assaulted her. Over defense counsel's objection, Popham testified that Sellers had told him that she had been assaulted by Petitioner on other occasions and further indicated that Sellers had informed him that she had another assault case pending against Petitioner.

David Dudas testified that in 1987, he and some of his friends were partying in a hotel room, when a stranger later identified as Petitioner demanded to be let in. When the door was opened, Petitioner punched Dudas in the face and hit him over the head with an empty beer bottle. The certificate of conviction for assault and battery was introduced.

Officer Mark Mead testified that he responded to the assault on Dudas. Petitioner was arrested at the scene and gave the false name of James Cole. Officer Thomas Randall also testified about responding to the assault on Dudas and testified, over defense objection, as to the motivation for using a false name.

Officer Barry Troszak testified that he took a report from Robert Rizzo, Jr. in 1986, in which Rizzo had told Troszak that he had approached a group of teenagers in the street for creating a disturbance. Two of the young men had chased him and had smashed his

9

head and face into the windshield of a car.  Rizzo identified one of these two men as being Petitioner.  The prosecutor introduced a certificate of conviction for assault and battery, which the prosecutor contended related to the assault on Rizzo.  The defense objected to the accuracy of this certificate of conviction.  Rizzo, who also testified as an alibi witness for Petitioner, insisted that the assault charges had been dismissed against Petitioner.  The prosecutor impeached Rizzo at length with this certificate of conviction.  Robert Rizzo, Sr. also testified about the assault on his son.

Tayser Mona also testified that he had witnessed Petitioner act in a violent manner on two or three prior occasions.  One of these involved a barroom brawl where Petitioner had hit several bouncers and had ripped a gate off of a door.

Detective Christian was asked whether he could confirm that Petitioner had violent tendencies.  Christian testified affirmatively, basing his conclusion on Petitioner's three prior assault convictions.  Christian also testified, in response to the prosecutor's questions, that the information used in requesting a warrant against Petitioner included "his prior assaultive history, convictions for assault."

Teresa Dina and Cynthia Dina were both cross-examined by the prosecutor about whether they knew about Petitioner's assaultive history.

When Petitioner testified that the certificate of conviction concerning Robert Rizzo, Jr. was false, Petitioner was forced to admit that the certificate of conviction which the prosecutor had indicated was for the assault on Robert Rizzo was actually a certificate of conviction for an assault by Petitioner on a Mark Plant.

Detective Christian was re-called as a witness and reiterated Petitioner's prior assault convictions.  Upon investigation, Detective Christian confirmed that the criminal

10

charges involving Robert Rizzo, Jr. had been dismissed.  However, Detective Christian testified at length about the fact that Petitioner had failed to appear in the Rizzo criminal case and that he had been found guilty of contempt of court and further testified that the certificate of conviction that had been introduced into evidence involved a complainant named Mark Plant.

Officer Mario Silvestri testified that he took a complaint from Mr. Plant in 1986, which involved Petitioner striking Plant in the face with his hands and kicking him in the face as well.

Petitioner presented several alibi witnesses, who claimed that Petitioner was present with them from approximately 11:00 p.m. on January 16, 1994 until the next morning, when he was dropped off at his brother's car wash at 8:00 a.m. on January 17, 1994.  One of these witnesses, Robert Rizzo, Jr., testified that Petitioner had a short brush cut at the time and that he had never known Petitioner to have long hair and a beard.  Another of these witnesses, Craig Cristini, also testified that Petitioner usually wore his hair short and that prior to his being incarcerated, he had never seen Petitioner with a beard.  Teresa Dina, a former girlfriend of Petitioner's, and her sister Cynthia Dina, testified that they were with Petitioner for Tina's birthday party on December 4, 1993, and again at Petitioner's Christmas family celebration that year, and that Petitioner had very short hair, namely a "buzzcut", on those occasions.  The women identified pictures of Petitioner from these events, which purported to show him with short hair.  Petitioner was also clean shaven in these pictures.  Teresa Dina saw Petitioner on January 8, 1994, and his hair was still a short buzz cut.  Petitioner's sister, Phyllis Tummel, also testified that she saw Petitioner on Christmas Eve, 1993, and identified photographs from that evening which showed

11

Petitioner with very short hair.  The three women also testified that Petitioner never drank coffee.

Anthony Marsiglio testified that he was employed by Mona at the body shop in January of 1994 and that a Daniel Brusseau also worked at the shop and slept there most of the time.  Marsiglio testified that he knew a Vito Patrico from being around the shop.

Brusseau's testimony from Mona's trial was read into the record, because he could not be located for Petitioner's trial.  Brusseau had testified that about 3:00 a.m. in January of 1994, he was awakened by sounds of loud music.  Brusseau looked around and found Mona sitting in his office.  Brusseau had never seen Mona there at that time of night. Petitioner was not permitted to bring in evidence that Brusseau, in his initial statement to the police and in a conversation with another employee, had indicated that on the night that he was awakened by loud music, he had seen Mona and Vito Patrico at the shop.  Craig Cristini, however, testified that Patricio had light sandy brown hair and was a friend of Mona's.

Paul Sawka testified that Petitioner had lived with him in Florida in 1991 and 1992 and that after Petitioner moved back to Michigan, a warrant came in the mail for Petitioner from Florida's Department of Motor Vehicles.  Sawka came to Michigan on January 18 or 19, 1994 to visit his son.  Sawka asked Petitioner to return to Florida with him to work on a construction project and the two men left togther on January 22, or 23, 1994.  When Sawka told Petitioner about the outstanding traffic warrant out of Florida, Petitioner began using the name Mark Sawka, the deceased brother of Paul Sawka.  Paul Sawka was not permitted to testify that he had suggested that Petitioner use his brother's name.  Sawka testified that Petitioner's hair was short and he never had any facial hair.

12

Petitioner also testified that he did not kill James Scott Bussell and was elsewhere at the time of the killing. Petitioner reiterated Paul Sawka's testimony concerning his reasons for going to Florida and further explained that he had used Mark Sawka's name when he was driving because Paul Sawka had informed him about the outstanding traffic warrants. Petitioner testified that he did not have long hair or a beard until he was incarcerated, and that was because of the cost of haircuts at the Macomb County Jail, as well as restrictions on razors.

In his closing arguments, the prosecutor made numerous remarks regarding Petitioner's prior assault charges and convictions. The prosecutor indicated that Petitioner was "a guy who is capable of pulling off this heinous crime and almost did." (Trial Tr., May 19, 1995, p. 114). The prosecutor argued that Petitioner "is like a time bomb ticking away, inevitably it will blow. He would kill somebody." (*Id.* at p. 116). The prosecutor further argued:

> And President Truman used to say history repeats itself. If you want to predict the future of a person, you obviously have to look at his past. And when you have a guy like Jimmy Cristini who hits people and kicks people in the head and face with dangerous objects, with no provocation, you know that it's going to happen again. (*Id.* at p. 117).

The prosecutor later stated:

> Who has the propensity to kick people in the head, strike them in the head with beer bottles, extinguish cigarettes on their face, smash their head in the windshield? James Cristini. This is inevitable. History repeats itself. (*Id.* at p. 120).

The prosecutor further argued that the jury would have to base its decision on all of the testimony, including Petitioner's violent background, to determine whether he committed the murder. (*Id.* at p. 126).

13

The prosecutor later pointed out that there was no evidence that Mona had committed any assaultive crimes (*Id.* at pp. 130-132) and then stated:

> But who has three assaultive convictions on his record involving the use of weapons or dangerous objects against the face or head of the victims?  It's Cristini.  The finger points towards him and him alone. (*Id.* at p. 131).

In rebuttal, the prosecutor argued that Petitioner was the man "capable" of kicking a person to death. (*Id.* at pp. 187-188).  The prosecutor also made the following remark:

> Can you imagine if you are going to pick anybody in the world as the second person, you are not going to pick this fellow because he [Mona] knows about his dangerous propensity for violence and he has been to prison. (*Id.* at p. 190).

Petitioner's conviction was affirmed on appeal. *People v. Cristini,* 188079 (Mich.Ct.App. July 17, 1998); *remanded* 461 Mich. 907; 603 N.W. 2d 783 (1999); *reconsideration den.* 461 Mich. 907; 607 N.W. 2d 724 (2000)(Kelly, J. would grant reconsideration and on reconsideration would grant leave to appeal).  On remand, the Michigan Court of Appeals again affirmed the conviction. *People v. Cristini,* 188079 (On Remand)(Mich.Ct.App. February 25, 2000); *lv. den.* 463 Mich. 919; 620 N.W. 2d 306 (2000).

On November 28, 2001, Petitioner filed an application for writ of habeas corpus with this Court.  On March 19, 2003, this Court dismissed the application without prejudice, because Petitioner's claim that the prosecutor had committed misconduct by extensively using Petitioner's prior assaultive behavior as character evidence had not been raised in the state courts as a federal constitutional claim or as a prosecutorial misconduct claim distinct from his claim that the admission of Petitioner's prior assaultive behavior violated M.R.E. 404(b)(1). *See Cristini v. McKee,* U.S.D.C. 01-74483-DT (E.D. Mich. March 19,

14

2003).

Petitioner subsequently filed a post-conviction motion for relief from judgment pursuant to M.C.R. 6.500, *et. seq.* The motion was denied by the trial court. *People v. Cristini,* 94-2485-FC (Macomb County Circuit Court, May 28, 2003). The Michigan Court of Appeals denied Petitioner's application for leave to appeal, but remanded the matter for an evidentiary hearing on Petitioner's claim of newly discovered evidence in support of his actual innocence claim. *People v. Cristini,* 249256 (Mich.Ct.App. November 20, 2003). The Michigan Supreme Court denied Petitioner's application for leave to appeal because it was not timely filed. [2]

On remand, Petitioner presented evidence and testimony that Tayser Mona had told two fellow inmates, Raad Matti and Bahaa S. Kalasho, that he had committed perjury against Petitioner and had fabricated his testimony. The trial court denied the motion for a new trial, finding the evidence lacking in credibility. *People v. Cristini,* 94-2485-FC (Macomb County Circuit Court, February 5, 2004). This decision was affirmed on appeal. *People v. Cristini,* 255040 (Mich.Ct. App. December 16, 2004); *lv. den.,* 472 Mich. 920; 696 N.W. 2d 714 (2005); *reconsideration den.* 473 Mich. 886; 699 N.W.2d 700 (2005).

While Petitioner's motion for a new trial was still pending in the state courts, Petitioner re-filed his petition for writ of habeas corpus, which added additional claims to his first habeas petition. This Court granted Petitioner's motion to re-instate the habeas petition and ordered a responsive pleading from respondent. Petitioner now seeks the issuance of a writ of habeas corpus on the following grounds:

---

[2] *See* Appendix P, attached to the Petition for Writ of Habeas Corpus.

15

I.  Petitioner's Fifth and Fourteenth Amendment rights under the United States Constitution were violated by egregious prosecutorial misconduct, which denied Petitioner a fair trial and due process. U.S. Const. Amends. V & XIV.

II.  Petitioner's Fifth and Fourteenth Amendment rights under the United States Constitution were violated by Petitioner not receiving a fair trial and due process, by the improper introduction and argument of evidence of prior unrelated assaultive behavior. U.S. Const. Amends. V & XIV.

III.  Petitioner's Sixth and Fourteenth Amendment rights under the United States Constitution were violated when his trial counsel was ineffective. U.S. Const. Amends. VI & XIV.

IV.  Petitioner's Sixth and Fourteenth Amendment rights under the United States Constitution were violated when his appellate counsel was ineffective on his appeal of right. U.S. Const. Amends. VI & XIV.

V.  Petitioner's Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution were violated when the trial judge told defense counsel not to object during the prosecutor's closing arguments. U.S. Const. Amends. V, VI & XIV.

VI.  Petitioner's Sixth and Fourteenth Amendment rights under the United States Constution were violated when the trial court repeatedly and improperly inhibited the presentation of the defense proofs, and considered either singly (sic) or cumulatively, fatally violated Petitioner's constitutional right to present a defense and to a fair trial. U.S. Const. Amends. V, VI, and XIV.

VII.  Petitioner's Fifth and Fourteenth Amendment rights under the United States Constitution were violated by the repeated instances of prosecutorial misconduct. U.S. Const. Amends. V & XIV

VIII.  Petitioner's Fifth and Fourteenth Amendment rights under the United States Constitution were violated when the trial court refused to suppress the identification of Ms. Ramsey, who had been exposed to a suggestive single-photograph identification procedure. U.S. Const. Amends. V & XIV.

IX.  Petitioner's Fifth and Fourteenth Amendment rights under the United States Constitution were violated when the delay in arrest and trial violated Petitioner's due process rights and prejudiced Petitioner, which was an intentional delay so the prosecution could gain a tactical advantage over the Petitioner. U.S. Const. Amends. V, and XIV.

16

X.  Petitioner's Fifth and Fourteenth Amendment rights under the United States Constitution were violated when the cumulative effect of the constitutional rights denied Petitioner due process. U.S. Const. Amends. V, and XIV.

On December 16, 2004, respondent filed a supplemental response to the petition. The Court is also willing to incorporate respondent's answer to the original petition for writ of habeas corpus as being part of the response to the amended petition, to the extent that the original answer addresses the issues that are being raised by Petitioner in his amended habeas petition.

## II.  Standard of Review

28 U.S.C. §2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision unreasonably applies the

17

law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

### III. Discussion

### A.  Claims # 1, 2, and 7.  The prosecutorial misconduct claims.

The Court will consolidate Petitioner's prosecutorial misconduct claims for purposes of judicial clarity.

Petitioner's primary claim is that he was deprived of his constitutional right to a fair trial by the prosecutor's extensive use of Petitioner's prior assaultive behavior as character evidence to prove Petitioner's propensity to commit the murder in this case.

Although not specifically addressed by respondent in her answer, the Court briefly discusses whether Petitioner's claim that the prosecutor improperly argued and used Petitioner's prior assaultive behavior as character evidence was properly exhausted with the Michigan courts. Although respondent failed to raise the exhaustion issue in either of her answers, this defense is not waived unless the State, through counsel, expressly waives the exhaustion requirement. *See Benoit v. Bock,* 237 F. Supp. 2d 804, 806 (E.D. Mich. 2003); 28 U.S.C. § 2254(b)(3). Moreover, "considerations of comity and federalism" require this Court to raise the exhaustion issue *sua sponte. Id.*

As indicated above, this Court dismissed Petitioner's original habeas petition without prejudice, because this prosecutorial misconduct claim had not been presented on Petitioner's direct appeal either as a federal constitutional claim or as a distinct prosecutorial misconduct claim. Petitioner returned to the state courts to properly exhaust

18

this claim by raising it in his motion for relief from judgment.  This motion was denied by the trial court and the Michigan Court of Appeals.  By his own admission, Petitioner's application for leave to appeal the Michigan Court of Appeals' first decision was rejected by the Michigan Supreme Court as being untimely.  Petitioner argues, however, that pursuant to M.C.R. 7.302(C)(4), he should have been able to have his prosecutorial misconduct claim reviewed by the Michigan Supreme Court when he filed an application for leave to appeal to that court following the remand of his case to the trial court for the evidentiary hearing on his newly discovered evidence claim.

The denial of a motion for relief from judgment is reviewable by the Michigan Court of Appeals and the Michigan Supreme Court upon the filing of an application for leave to appeal. M.C.R. 6.509; M.C.R. 7.203; M.C.R. 7.302. *See Nasr v. Stegall,* 978 F. Supp. 714, 717 (E.D. Mich. 1997).  A criminal defendant in Michigan must appeal the denial of a post-conviction motion to the Michigan Court of Appeals and the Michigan Supreme Court in order to satisfy the exhaustion requirement of raising his claims at all levels of state court review. *See Mohn v. Bock,* 208 F. Supp. 2d 796, 800 (E.D. Mich. 2002).

Petitioner is correct that M.C.R. 7.302(C)(4) gives a party to an appeal in Michigan the option, after the Michigan Court of Appeals has issued a judgment ordering a remand, of seeking an immediate appeal of the Michigan Court of Appeals' decision or of waiting until proceedings following remand are completed, before seeking plenary appeal of all of the claims raised in the initial appeal. *See Michigan State AFL-CIO v. Michigan Civil Service Com'n,* 455 Mich. 720, 731; 566 N.W. 2d 258 (1997).  Pursuant to Michigan law, Petitioner could have awaited the conclusion of his newly discovered evidence claim on remand with the Macomb County Circuit Court before seeking review of all of his post-

19

conviction claims, including his prosecutorial misconduct claim, in the Michigan Supreme Court. Because Petitioner attempted to raise his prosecutorial misconduct claim in his application for leave to appeal to the Michigan Supreme Court following the remand of his case to the trial court, it appears that this claim may have been exhausted.

However, assuming that Petitioner's first prosecutorial misconduct claim has not been properly exhausted, Petitioner no longer has any available state court remedies with which to exhaust this claim. Under M.C.R. 6.502(G)(1), a criminal defendant in Michigan can file only one motion for relief from judgment with regard to a criminal conviction. *Hudson v. Martin*, 68 F. Supp. 2d 798, 800 (E.D. Mich. 1999)(citing to *People v. Ambrose*, 459 Mich. 884; 587 N. W. 2d 282 (1998)). M.C.R. 6.502(G)(2)states that a defendant may file a second or subsequent motion based on a retroactive change in law that occurred after the first motion for relief from judgment or a claim of new evidence that was not discovered before the first such motion. *Hudson,* 68 F. Supp. 2d at 800-01. Petitioner's prosecutorial misconduct claim does not appear to be based upon a retroactive change in the law or upon a claim of newly discovered evidence. Therefore, it appears that Petitioner would be procedurally barred under Michigan law from filing a second motion for relief from judgment to exhaust this claim. To the extent that this claim is unexhausted, it might be procedurally defaulted due to the fact that Petitioner no longer has any available state court remedies with which to present this claim to the Michigan courts. *See Hannah v. Conley*, 49 F. 3d 1193, 1195-96 (6th Cir. 1995).

This Court will not enforce any possible procedural default of Petitioner's prosecutorial misconduct claim involving the prosecutor's improper use of character evidence because respondent failed to raise the defense of procedural default in her

20

supplemental response to the petition for writ of habeas corpus. *Benoit,* 237 F. Supp. 2d at 807.  As the judge in *Benoit* indicated, with the exception of the exhaustion issue, "the Sixth Circuit strongly discourages the *sua sponte* invocation of procedural affirmative defenses that were not raised by the respondent." *Id.* (*Citing to Scott v. Collins,* 286 F. 3d 923, 928-29 (6th Cir. 2002)).  Thus, although the issue of exhaustion must be expressly waived by respondent, "the same is not true for the affirmative defense of procedural default." *Id.*  Therefore, respondent's failure to raise the procedural default defense can be considered an implicit waiver of that issue.  *Benoit,* 237 F. Supp. 2d at 807.

The Court further notes that some of Petitioner's remaining prosecutorial misconduct claims were rejected by the Michigan Court of Appeals on Petitioner's direct appeal because of trial counsel's failure to object.  Under Michigan law, a criminal defendant is required to object to prosecutorial misconduct in order to preserve such a claim for appellate review. *See Burton v. Bock,* 320 F. Supp. 2d 582, 589 (E.D. Mich. 2004).  The failure to make a contemporaneous objection is recognized as an independent and adequate state law ground for refusing to review trial errors.  *Id.*  (Citing *Coleman v. Thompson,* 501 U.S. 722, 750-51 (1991)).  However, respondent never argued that Petitioner's remaining prosecutorial misconduct claims were procedurally defaulted, either in her original or supplemental responses to the habeas petition, chosing instead to argue the claims on the merits.  By failing to argue that Petitioner's remaining prosecutorial misconduct claims are procedurally defaulted in either of her response briefs, respondent has waived any defense that Petitioner's remaining prosecutorial misconduct claims are procedurally defaulted.  *See Baze v. Parker,* 371 F. 3d 310, 320 (6th Cir. 2004); *cert. den.,* 125 S. Ct. 1670 (2005).  The Court will therefore proceed to review the merits of

21

Petitioner's claims.

When a petitioner seeking habeas relief makes a claim of prosecutorial misconduct, the reviewing court must consider that the touchstone of due process is the fairness of the trial, not the culpability of the prosecutor. On habeas review, a court's role is to determine whether the conduct was so egregious as to render the entire trial fundamentally unfair. *Serra v. Michigan Department of Corrections*, 4 F. 3d 1348, 1355-1356 (6th Cir. 1993). When analyzing a claim of prosecutorial misconduct, a court must initially decide whether the challenged statements were improper. *Boyle v. Million*, 201 F. 3d 711, 717 (6th Cir. 2000). If the conduct is improper, the district court must then examine whether the statements or remarks are so flagrant as to constitute a denial of due process and warrant granting a writ. *Id.* In evaluating prosecutorial misconduct in a habeas case, consideration should be given to the degree to which the challenged remarks had a tendency to mislead the jury and to prejudice the accused, whether they were isolated or extensive, whether they were deliberately or accidentally placed before the jury, and, except in the sentencing phase of a capital murder case, the strength of the competent proof against the accused. *Serra,* 4 F. 3d at 1355-56.

Petitioner's primary prosecutorial misconduct claim is that he was deprived of his constitutional right to a fair trial by the prosecutor's extensive use of Petitioner's prior assaultive behavior as character evidence to prove his propensity to commit the murder in this case. In addressing Petitioner's related 404(b)(1) claim on direct appeal, the Michigan Court of Appeals held that the trial court abused its discretion in admitting these prior assaultive convictions into evidence because the convictions were not logically relevant to proving that he committed the murder. *People v. Cristini,* Slip. Op. No. 188079,

22

* 3-4.  With regards to the prosecutor, the Michigan Court of Appeals noted:

> "[M]oreover, throughout the trial, but particularly in opening statement and closing argument, the prosecutor used the 'bad-acts evidence,' which went beyond the three prior assault convictions allowed by the trial court at the pre-trial motion hearing, to argue that defendant had a propensity for assaulting people and that he acted in conformity with his character by fatally assaulting Bussell."

Id. at * 4.

The Michigan Court of Appeals, however, found the error to be harmless, in light of Mona's testimony, as well as the testimony of other witnesses who corroborated Mona's version of events. Id. at * 4-5.

A criminal defendant's 'bad character' cannot be used to argue that the defendant committed the crime for which he is being tried, or had the propensity to commit that crime. See Washington v. Hofbauer, 228 F. 3d 689, 699 (6th Cir. 2000).  When a prosecutor dwells on a defendant's bad character in an attempt to argue that the defendant committed the charged crime, or had the propensity to commit that crime, a federal court may find prosecutorial misconduct. Id.

In the present case, as the Michigan Court of Appeals indicated, the prosecutor made extensive use of Petitioner's prior assaultive behavior throughout trial and in his opening and closing arguments to establish that Petitioner was a bad character and had the propensity to commit the murder.  Further compounding the misconduct was the fact that the prosecutor elicited evidence concerning prior assaultive behavior for which there had been no conviction, including an assault charge which had been dismissed against Petitioner.  In addition, the prosecutor also brought up other aspects of Petitioner's alleged bad character in closing argument, noting that Petitioner's driver's license had expired, that

23

Petitioner had failed to pay parking tickets, that he failed to appear several times in court on these matters, and that Petitioner mistreated women.  Because the prosecutor improperly used Petitioner's assaultive behavior and other character evidence to prove Petitioner's propensity to commit the murder, and because this character attack pervaded the entire trial, Petitioner has established that the prosecutor violated his right to a fair trial. *Washington,* 228 F. 3d at 700*; See also Hodge v. Hurley,* 426 F. 3d 368, 384 (6th Cir. 2005)(finding that the prosecutor engaged in misconduct by inappropriately emphasizing petitioner's bad character, which was in no way related to the crime charged).

The prosecutor further denied Petitioner a fair trial by arguing that several of Petitioner's alibi witnesses had lied or committed perjury, when there was no evidence presented to support those allegations.

A prosecutor may not express a personal opinion concerning the guilt of a defendant or the credibility of trial witnesses because such personal assurances of guilt or vouching for the veracity of witnesses by the prosecutor "exceeds the legitimate advocates' role by improperly inviting the jurors to convict the defendant on a basis other than a neutral independent assessment of the record proof." *Caldwell v. Russell*, 181 F. 3d 731, 737 (6th Cir. 1999).  In addition, it is improper for a prosecutor during closing arguments to bring to the jury any purported facts which have not been introduced into evidence and which are prejudicial. *Byrd v. Collins*, 209 F. 3d 486, 535 (6th Cir. 2000). Finally, the actions of a prosecutor in misrepresenting facts in evidence can amount to substantial error, because doing so "may profoundly impress a jury and may have a significant impact on the jury's deliberations." *Washington*, 228 F. 3d at 700.

In the present case, the prosecutor engaged in misconduct when he argued that

24

the defense witnesses in this case committed perjury, in the absence of any evidence to support such a claim. *See Hodge,* 426 F. 3d at 380-83. While this misconduct alone might be insufficient to grant Petitioner habeas relief, in light of the prosecutor's extensive use of character evidence to prove Petitioner's propensity to commit the murder, the prosecutor's accusations contributed to denying Petitioner a fair trial.

The question for this Court is whether Petitioner is entitled to habeas relief on his claim.

In *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995), the U.S. Supreme Court held that when a federal court judge in a habeas proceeding is in "grave doubt" about whether a trial error of federal constitutional law had a substantial and injurious effect or influence in determining the jury's verdict, the error is not harmless and the petitioner must win. The focus in such a situation is not merely whether there is enough evidence to support the result, apart from the phase affected by the error. It is, rather, even so, whether the error itself has substantial influence. If so, or a judge is left in grave doubt, the conviction cannot stand. *O'Neal,* 513 U.S. at 438. Only if a federal habeas court can say with certainty that a trial error had little or no impact on the judgment, should the judgment stand. *See Barker v. Yukins*, 199 F. 3d 867, 874 (6th Cir. 1999).

In *Boyle v. Million,* 201 F. 3d at 717, the Sixth Circuit held that habeas relief was warranted on a habeas petitioner's prosecutorial misconduct claim, despite the relatively strong evidence against the petitioner, in light of the fact that the prosecutor's misconduct was flagrant, was intended to mislead and prejudice the jury, and the improprieties infected all aspects of the trial, such that the error could not be deemed harmless. In light of "the egregious and inflammatory nature" of the behavior and arguments of the

prosecutor throughout trial, the Sixth Circuit was left with "grave doubt" as to whether the prosecutorial errors had a substantial and injurious effect or influence in determining the jury's verdict. *Id.* at 718.

In the present case, this Court is in grave doubt about whether the prosecutorial misconduct in this case had a substantial and injurious effect or influence in determining the jury's verdict. First, the prosecutor's misconduct was flagrant and severe and pervaded the entire trial proceedings and was designed to prejudice the jurors against Petitioner. This is particularly so, in light of the fact that the prosecutor's questions, comments, and arguments were "[p]art of the prosecutor's continuous effort to have the jury determine credibility based on improper considerations," such as improper character assessments of Petitioner. *Washington,* 228 F. 3d at 709.

Secondly, the only witness who actually testified to witnessing Petitioner kill the victim was Tayser Mona, who had himself been convicted for his role in the murder and who was testifying against Petitioner in exchange for a reduction in the habitual offender conviction against Mona and a promise for him to be incarcerated in a federal prison. Although the Michigan Court of Appeals indicated that aspects of Mona's testimony had been corroborated by other witnesses, some of those witnesses were related to Mona. In addition, there were many inconsistencies in Mona's testimony. In particular, the Michigan Court of Appeals ignored the testimony of garbage collector, Darold Sayler, whose testimony that he saw three men in the alley where the victim's body was found, contradicted Mona's testimony that only he and Petitioner were in the alley. The Michigan Court of Appeals also ignored Detective Christian's testimony that there appeared to have been a significant struggle at Mona's auto body shop and that it would be difficult to

26

explain that Mona was not involved in the assault.  This testimony called into question Mona's testimony that he was not involved in the actual assault upon the victim.

In addition, although Charlene Ramsey identified Petitioner as being the person she saw pumping gasoline at the gas station on the morning of the murder, her co-worker, Malicia Christian, was unable to positively identify Petitioner as having been at the Amoco Station on the morning of the murder.  Moreover, Ramsey described the blonde haired man whom she identified as Petitioner as having long, collar length hair, and a moustache and facial hair.  Several other witnesses, however, testified that Petitioner had short hair at the time of the victim's murder.

Significantly, the Michigan Court of Appeals acknowledged that there was no physical evidence linking Petitioner to the crime.  None of the employees at Tycoon's Bar, where Mona claimed that he, Petitioner, and the victim had gone to on the night of the murder, could identify any of the three men as having been there that night.  Police were also unable to find the evidence which Mona claimed that Petitioner had discarded along Eight Mile Road.

Finally, Petitioner presented several alibi witnesses who claimed that he was with them at the time of the events surrounding the murder and the disposal of the victim's body.

In light of the competing evidence in this case, this Court has grave doubt about whether the pervasive prosecutorial misconduct in this case was harmless. *Barker,* 199 F. 3d at 874; *See also Paxton v. Ward,* 199 F. 3d 1197, 1219 (10th Cir. 1999)(where prosecutorial misconduct permeated the entire capital sentencing proceeding, grave doubt existed as to whether the error harmless, because the Tenth Circuit was unable to

separate the effect that the misconduct had on the jury's decision to sentence petitioner to death). In order for this Court to find the misconduct here to be harmless, it would have to believe only the prosecution's evidence but discredit the defense evidence in this case. *Barker,* 199 F. 3d at 874. However, it is neither the proper role for a state appellate court, nor for this Court, "[t]o stand in the place of the jury, weighing competing evidence and deciding that some evidence is more believable than others." *Id.* at 874-75. Rather, it is for the jury to make that determination, unhindered by any egregious prosecutorial misconduct in this case.

This Court concludes that the prosecutorial misconduct in this case was pervasive and deprived Petitioner of a fair trial. "[I]n a close credibility contest such as this, with horrible acts alleged but scant hard evidence for the jury to weigh, a prosecutor must be doubly careful to stay within the bounds of proper conduct." *Washington,* 228 F. 3d at 709. Accordingly, the Court will grant a conditional writ of habeas corpus, giving the State of Michigan ninety days in which to provide Petitioner a new trial or release him. *Id.*

Because the Court's conclusion that Petitioner is entitled to habeas relief on these prosecutorial misconduct claims is dispositive of the petition, the Court considers it unnecessary to review Petitioner's other claims and declines to do so. *See Haynes v. Burke,* 115 F. Supp. 2d 813, 819-820 (E.D. Mich. 2000); *Berrier v. Egeler*, 428 F. Supp. 750, 754 (E.D.Mich.1976).

## IV. ORDER

**IT IS HEREBY ORDERED THAT PETITIONER'S APPLICATION FOR WRIT OF HABEAS CORPUS IS CONDITIONALLY GRANTED. UNLESS THE STATE TAKES**

28

ACTION TO AFFORD PETITIONER A NEW TRIAL WITHIN NINETY (90) DAYS OF THE DATE OF THIS OPINION, HE MAY APPLY FOR A WRIT ORDERING RESPONDENT TO RELEASE HIM FROM CUSTODY FORTHWITH.

IT IS FURTHER ORDERED that Respondent serve a copy of this Opinion and Order to the appropriate State Court and Prosecuting Attorney within ten (10) days' receipt of this Opinion and Order.  Respondent must file a proof of service with the Court.

IT IS FURTHER ORDERED that:

1) Petitioner's Motion Requesting Permission to Supplement Newly Filed Motion to Hold "New" Evidentiary Hearing on Newly Discovered Evidence (Docket No. 80, filed April 20, 2005) is MOOT.

2) Petitioner's Motion Pursuant to Fed. R. Civ. P. 15(a) (Docket No. 84, filed July 11, 2005) is MOOT.

3) Petitioner's Motion Proving that Petitioner Finally Exhausted State Remedies and this Case/Cause is Now Finally Ripe for Consideration (Docket No. 85, filed August 23, 2005) is MOOT.

4) Petitioner's Motion to Change Respondent Due to Transfer (Docket No. 87, filed August 23, 2005) is MOOT.

5) Petitioner'S Motion to Submit to Court Supplemental Authority (Docket No. 88, filed August 23, 2005) is GRANTED.

6) Petitioner's Motion for Leave to File Supplemental Authority (Docket No. 91, filed September 28, 2005) is GRANTED.

29

2:01-cv-74483-DPH   Doc # 98   Filed 03/28/06   Pg 30 of 30   Pg ID 3671

7) Petitioner's Motion for Liberal Construction of All Pleadings, Motions, Petitions filed In Pro Per (Docket No. 92, filed September 28, 2005) is MOOT.

8) Petitioner's Motion for Leave to File Supplement Authority with Supplemental Argument (Docket No. 94, filed October 6, 2005) is GRANTED.

9) Petitioner's Motion to Change Respondent Due to Transfer (Docket No. 96, filed February 17, 2006) is MOOT.

 

 

                                           **/s/ DENISE PAGE HOOD**
                                           **HONORABLE DENISE PAGE HOOD**
                                           **UNITED STATES DISTRICT JUDGE**

**Dated: March 28, 2006**

 

 

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 28, 2006, by electronic and/or ordinary mail.

                                           **s/William F. Lewis**
                                           **Case Manager**